965 F.2d 848
 61 USLW 2015
 UNITED STATES of America, Plaintiff-Appellee,
v.
P.H.E., INC. a/k/a Adam & Eve, a North Carolina corporation,
Philip D. Harvey, Alan C. Bushnell, Ann F.
Buzenberg, Frederic W. Fuller, Jr.,
Richard W. Loy and Peggy A.
Horton, Defendants-Appellants,
American Civil Liberties Union Foundation, American Civil
Liberties Union of Utah Foundation, People for the American
Way, Playboy Enterprises, Inc., American Booksellers
Foundation for Free Expression, Association of American
Publishers, Inc., Council for Periodical Distributors
Associations, the Freedom to Read Foundation, Independent
Video Retailers Association, International Periodical
Distributors Association, Inc., Magazine Publishers of
America, National Association of College Stores, Inc.,
Recording Industry Association of America, Inc., Amici Curiae.
 No. 91-4149.
 United States Court of Appeals,
Tenth Circuit.
 May 26, 1992.
 
 Richard N.W. Lambert, Asst. U.S. Atty., Salt Lake City, Utah (David J. Jordan, U.S. Atty., with him on the brief), for plaintiff/appellee.
 Bruce J. Ennis, Jr. of Jenner & Block, Washington, D.C. (David W. Ogden, John B. Morris, Jr., Julie M. Carpenter, Steven R. Escobar of Jenner & Block, Washington, D.C., and Jerome H. Mooney, III of Mooney and Associates, Salt Lake City, Utah, with him on the brief), for defendants/appellants.
 Burt Neuborne, New York City, Burton Joseph of Barsy, Joseph & Lichtenstein, Chicago, Ill., filed an amicus curiae brief for Playboy Enterprises, Inc.
 Kathryn D. Kendell, ACLU of Utah Foundation, Salt Lake City, Utah, Steven R. Shapiro, Marjorie Heins, American Civil Liberties Union Foundation, New York City, Elliot M. Mincberg, People for the American Way, Washington, D.C., filed an amicus curiae brief for the American Civil Liberties Union, ACLU of Utah Foundation and People for the American Way.
 Michael A. Bamberger, Kenneth J. Pfaehler of Sonnenschein Nath & Rosenthal, New York City, filed an amicus curiae brief for American Booksellers Foundation for Free Expression, Ass'n of American Publishers, Inc., Council for Periodical Distributors Associations, the Freedom to Read Foundation, Independent Video Retailers Ass'n, Intern. Periodical Distributors Ass'n, Inc., Magazine Publishers of America, Nat. Ass'n of College Stores, Inc., and Recording Industry Ass'n of America, Inc.
 Before MOORE, ALDISERT,* and McWILLIAMS, Circuit Judges.
 ALDISERT, Circuit Judge.
 
 
 1
 The First Amendment bars a criminal prosecution where the proceeding is motivated by the improper purpose of interfering with the defendant's constitutionally protected speech. Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1975). This appeal by defendants who unsuccessfully moved to dismiss an indictment charging violations of federal obscenity law presents that issue for our consideration.
 
 
 2
 Jurisdiction was proper in the trial court based on 18 U.S.C. § 1461 (criminalizing the use of United States mail to send obscene materials). Jurisdiction in this court is contested; the appellants maintain that jurisdiction lies under 28 U.S.C. § 1291, as interpreted in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), and related cases. The appeal was timely filed. Rule 4(a), Fed.R.App.P.
 
 
 3
 In the posture in which this case comes to us we must first meet the objection raised by the government that this court lacks jurisdiction to hear the appeal. Should we determine that we possess jurisdiction we must then examine for clear error the district court's finding of fact that this prosecution in Utah was not tainted by the "questionable motives and zealotry exhibited by prosecutors and government officials in ... points East", Dist.Ct.Op. at 7; we must review also the district court's legal determination that former United States Attorney Dee Benson's participation cleansed the indictment of any impropriety alleged to have been previously manifested by his assistant, Richard N.W. Lambert, and others presently or formerly in the office of the United States Attorney for the District of Utah.
 
 I.
 
 4
 The court's findings regarding the participation of the prosecutors are findings of fact reviewable under the clearly erroneous standard. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). The court's conclusions of law are examined de novo. In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1266 (10th Cir.1988). The extent of this court's jurisdiction is a question of law which we determine in the first instance. See McGeorge v. Continental Airlines, Inc., 871 F.2d 952, 953 (10th Cir.1989).
 
 II.
 
 5
 In 1985, then Utah United States Attorney Brent Ward sent a letter to then Attorney General Edwin Meese. This letter proposed a coordinated, nationwide prosecution strategy against companies that sold obscene materials:
 
 
 6
 The heart of this strategy calls for multiple prosecutions (either simultaneous or successive) at all levels of government in many locations. If thirty-five prosecutors comprise the strike force, theoretically thirty-five different criminal prosecutions could be instigated simultaneously against one or more of the major pornographers.... I believe that such a strategy would deal a serious blow to the pornography industry.... This strategy would test the limits of pornographers' endurance. I believe the targeted companies would curtail their operations and withdraw from and refrain from entering geographical markets in which they could not find community acceptance.
 
 
 7
 App. 1427-28. In a later letter, Ward emphasized the financial burden that multiple prosecutions would put on the defendants:
 
 
 8
 As profitable as these enterprises may be, there is a limit to the prison terms, fines and forfeiture of assets to which obscenity distributors will subject themselves. Multiple, simultaneous prosecutions at both federal and local levels therefore carry the potential to undermine profitability to the point that the survival of obscenity enterprises will be threatened.
 
 
 9
 App. 1432.
 
 
 10
 Assistant United States Attorney Richard N.W. Lambert, one of the prosecutors in the present case, worked with Ward in developing the idea of multiple prosecutions. App. 1015. (Lambert represented the government by brief and in oral argument before us in these proceedings, even though he also serves as a critical witness.) He described the potential benefits of the strategy in his deposition testimony. App. 1017-18. The plan by its nature would require the cooperation of prosecutors in other jurisdictions. The United States Attorney's office in the Eastern District of North Carolina, which later investigated but did not prosecute PHE, became involved in this strategy at an early stage. Regarding the multiple prosecution strategy in general, Lambert stated: "I think we understood from the beginning that we--that is, our office and the U.S. Attorney's office in North Carolina--would coordinate our efforts together." App. 1067.
 
 
 11
 In response to the Ward letters and to other expressions of concern over pornography, Attorney General Meese created the National Obscenity Enforcement Unit in February 1987 to oversee the prosecution of obscenity violations nationwide. Justice Department policy then in effect discouraged multiple obscenity prosecutions unless the materials were unquestionably obscene. In September 1987, the Justice Department changed its policy discouraging multiple prosecutions, stating that such tactics were now encouraged when prosecuting large organizations. PHE, Inc. v. Department of Justice, 743 F.Supp. 15, 19 (D.D.C.1990).
 
 
 12
 The Department commenced "Project PostPorn" in July 1988, a series of multidistrict prosecutions of distributors of sexually oriented materials. Lambert handled some of these indictments, but PHE was not one of the companies targeted in Project PostPorn. Id. at 19-20.
 
 
 13
 Lambert's dealings with the defendants began in 1986. In May of that year, PHE's premises in North Carolina were searched by federal and state agents, including federal prosecutors from Utah and the Eastern District of North Carolina. Id. at 17-18. These officials posted guards at all the doors, ordered employees to submit to interviews, searched their personal handbags and briefcases and denied access to lawyers. Id. at 18. Federal agents also served PHE's employees with 118 subpoenas. Id.
 
 
 14
 Lawyers for the defendants met with Ward and Lambert in September 1986 to see if a plea agreement could be worked out. At these meetings, Ward and Lambert stated that the only way the defendants could avoid multiple prosecutions was by ceasing distribution in Utah of all sexually oriented materials, not simply those that were obscene (an exception was made for films that had received an "R" rating from the Motion Picture Association of America). Id. It bears emphasis that Ward and Lambert acknowledged that this would require the company to stop sending material that was protected by the First Amendment. Id. No plea agreement was reached.
 
 
 15
 In the course of these negotiations, Lambert stated that if no plea agreement was reached, prosecutions could be brought in Utah, North Carolina and elsewhere in the country. App. 382. Lambert specifically mentioned possible prosecutions in the Eastern District of North Carolina and in the state courts of Alamance County, North Carolina. App. 376, 382.
 
 
 16
 Lambert's prophecy proved correct, because the company and various individuals were indicted on obscenity charges in Alamance County in August 1986 that went to trial and ended in an acquittal in 1987. 743 F.Supp. at 19. PHE stated that it expended more than $700,000 in connection with the search of its premises and its defense of the Alamance County obscenity charges. Id. at 26 n. 42. No federal charges were brought by the United States Attorney for the Eastern District of North Carolina, but the Utah United States Attorney's office continued its interest in prosecuting PHE. Lambert flew to North Carolina in 1989 to review evidence collected there.
 
 
 17
 Meanwhile, a federal grand jury in the Western District of Kentucky subpoenaed company documents in 1989, as part of an investigation by Terry Cushing, Assistant United States Attorney for the Western District. Id. at 20. Cushing stated that on numerous occasions he and Lambert discussed their investigations and that he saw no problem with bringing coordinated prosecutions in both Utah and the Western District of Kentucky. Id.
 
 
 18
 It is clear that there was extensive communication and coordination between Lambert and federal and state prosecutors elsewhere. Lambert was involved in the strategy of multiple prosecutions from its inception. He stated that the United States Attorney's office in Utah planned to coordinate its efforts with the United States Attorney's office in the Eastern District of North Carolina. He told counsel for the defendants that failure to comply with plea agreements could result in multiple prosecutions. He discussed the strategy with the Assistant United States Attorney in the Western District of Kentucky.
 
 
 19
 The company and Philip D. Harvey, its president and a defendant in this case, sought an injunction in the federal district court for the District of Columbia against the Department of Justice and various individuals, including Lambert. The court granted a preliminary injunction barring Lambert and others from "causing or permitting indictments charging violations of 18 U.S.C. §§ 1461-65 to be returned against plaintiffs, or either of them, in more than one federal judicial district within the United States," pending a ruling on the permanent injunction. PHE, Inc. v. Department of Justice, 743 F.Supp. 15, 28 (D.D.C.1990). The court also made extensive findings of fact, not controverted by the parties in the present appeal, which we adopt as cited and summarized herein. The court stated its conclusions thus:
 
 
 20
 The intrusive and intimidating manner in which defendants searched plaintiffs' premises, the 118 subpoenas which another federal court characterized as "harassment" of plaintiffs, the acknowledgement by the defendants that many of the materials they seek to prevent plaintiffs from distributing are constitutionally protected, the allegation that investigations were initiated despite the fact that the FBI advised [the] Assistant United States Attorney for the Eastern District of North Carolina[ ] that the materials distributed by plaintiffs were not within the scope of FBI guidelines for the prosecution or investigation of obscenity, the threats of multiple prosecutions if plaintiffs did not cease distribution of certain materials nationwide and cease distribution entirely in Utah, including Playboy magazine and The Joy of Sex, and the admitted desire to get Harvey "out of the business," substantiate plaintiffs' allegations of bad faith.
 
 
 21
 Id. at 25-26 (footnotes omitted).
 
 
 22
 Following the issuance of the preliminary injunction in Washington, D.C., Lambert prepared a prosecution memorandum in Utah stating that PHE and the other defendants had violated federal obscenity laws by mailing obscene materials into Utah. The memorandum and evidence were reviewed by a screening committee headed by then United States Attorney for Utah, Dee Benson, who had replaced Ward. It is controverted as to when the evidence was presented to the Utah grand jury. The government says that Benson presented it; the defendants contend that the grand jury was already considering the case when Benson was brought in "[a]t the very last minute." Appellants' Br. at 2. The grand jury returned an indictment which is the subject of the present appeal. This indictment is also the second criminal prosecution instituted against PHE in which Lambert has played a role.
 
 
 23
 PHE and Harvey returned to the district court for the District of Columbia to move for additional injunctive relief against the Utah prosecution, and the court denied the motion by unpublished disposition. PHE, Inc. v. United States Dep't of Justice, No. Civ.A. 90-0693(JHG), 1991 WL 25753 (D.D.C. Feb. 6, 1991). All the defendants in the present case then moved in the Utah district court for dismissal, arguing that the prosecution was in bad faith.
 
 
 24
 The district court rejected the claim that the Utah prosecution was brought in retaliation for the civil suit in the District of Columbia. This contention is not pressed on appeal. The court rejected the argument that the Utah prosecution was driven by the improper purpose of preventing the defendants from selling constitutionally protected materials in the state.
 
 
 25
 The court recognized the teachings of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), and United States v. Raymer, 941 F.2d 1031 (10th Cir.1991), yet concluded that the prosecution was valid:
 
 
 26
 Defendants have presented voluminous evidence, some contested, of questionable motives and zealotry exhibited by prosecutors and government officials in North Carolina, Washington, D.C., and other points East. Defendants have failed, however, to connect such conduct in any significant way with the decision to seek an indictment against defendants in Utah in September 1990. The final decision to seek an indictment was made by an independent screening committee under the direction of United States Attorney Dee Benson, who played no role in the previous four-year investigation of PHE and the resulting plea negotiations. As the government convincingly notes, there is no allegation of bad faith motivation on the part of Benson nor is any improper motive to be found in the prosecution memorandum prepared by Lambert and upon which Benson relied in deciding to seek an indictment.
 
 
 27
 Dist.Ct.Op. at 7. The court therefore denied the motion to dismiss the indictment.
 
 
 28
 The defendants appeal, arguing that (1) the district court applied the incorrect legal standard in determining that the participation of Benson cleansed the prosecution of any improper motives, and (2) the Utah prosecution is motivated by a punitive animus and bad faith desire to prevent the appellants from engaging in constitutionally protected activities. At oral argument, the counsel for the appellants emphasized that the relief requested was remand to the district court for factual findings concerning the effect of any improper prosecutorial motives on the decision to seek an indictment. The government moved for a dismissal of the appeal for lack of jurisdiction and also met the appellants' substantive contentions.
 
 III.
 
 29
 The overarching consideration that forms the backdrop of the district court proceedings is whether the foregoing facts activate the constitutional precept that a prosecution motivated by a desire to discourage expression protected by the First Amendment is barred and must be enjoined or dismissed, irrespective of whether the challenged action could possibly be found to be unlawful. See Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) ("[T]he decision to prosecute may not be 'deliberately based upon an unjustifiable standard' ... including the exercise of protected statutory and constitutional rights."); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1975); Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). See also Lewellen v. Raff, 843 F.2d 1103, 1109-10 (8th Cir.1988), cert. denied, 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989); Fitzgerald v. Peek, 636 F.2d 943, 945 (5th Cir.), cert. denied, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981).
 
 
 30
 The appellants contend before us, as they did before the district court, that the First Amendment affords scant protection unless it is understood to include "a right not to be tried." United States v. Hollywood Motor Car Co., Inc., 458 U.S. 263, 267, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982) (per curiam) (citing United States v. MacDonald, 435 U.S. 850, 860-61, 98 S.Ct. 1547, 1552-53, 56 L.Ed.2d 18 (1978)). It is a right, they argue, "which must be upheld prior to trial if it is to be enjoyed at all," id. (quoting 435 U.S. at 861, 98 S.Ct. at 1553) and is a "right effectively unreviewable on appeal from a final judgment." Id. (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457-58, 57 L.Ed.2d 351 (1978)).
 
 A.
 
 31
 In the context of this assertion under the First Amendment of "a right not to be tried", we address the question of our jurisdiction. Under 28 U.S.C. § 1291, the courts of appeals have jurisdiction of appeals from final judgments. The Supreme Court has recognized a limited exception for certain collateral orders that do not terminate an action. Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949). In Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), the Court stated that non-final collateral orders are appealable if they meet three conditions:
 
 
 32
 1. The district court "had fully disposed of the question ...; in no sense did it leave the matter 'open, unfinished, or inconclusive.' "
 
 
 33
 2. "[T]he decision was not simply a 'step toward final disposition of the merits of the case' ...; rather, it resolved an issue completely collateral to the cause of action asserted."
 
 
 34
 3. "[T]he decision had involved an important right which would be 'lost, probably irreparably,' if review had to await final judgment...."
 
 
 35
 Id. at 658, 97 S.Ct. at 2039-40 (quoting Cohen, 337 U.S. at 546, 69 S.Ct. at 1225-26).
 
 
 36
 The appellants contend that the prosecution must be barred because the prosecutors are motivated by a bad faith desire to chill the exercise of First Amendment rights. In other contexts, the Supreme Court has held that a trial court's refusal to grant immunity from suit is appealable. E.g., Mitchell v. Forsyth, 472 U.S. 511, 525, 105 S.Ct. 2806, 2814-15, 86 L.Ed.2d 411 (1985) (denial of qualified immunity defense immediately appealable); Helstoski v. Meanor, 442 U.S. 500, 506, 99 S.Ct. 2445, 2448, 61 L.Ed.2d 30 (1979) (rejection of claim of immunity under Speech and Debate Clause is appealable); Abney, 431 U.S. at 662, 97 S.Ct. at 2041-42 (pretrial order rejecting double jeopardy claim is appealable).
 
 
 37
 In all these cases the Court's recognition that the substantive constitutional right at stake included the right to be free from the adverse effect of undergoing the trial itself caused the Court to invoke the collateral order doctrine. The Court, however, has "interpreted the collateral order exception 'with the utmost strictness' in criminal cases." Midland Asphalt Corp. v. United States, 489 U.S. 794, 799, 109 S.Ct. 1494, 1498, 103 L.Ed.2d 879 (1989) (quoting Flanagan v. United States, 465 U.S. 259, 265, 104 S.Ct. 1051, 1054-55, 79 L.Ed.2d 288 (1984)).
 
 
 38
 Our immediate inquiry, therefore, is whether the First Amendment right to be free from pretextual criminal prosecutions, brought not by a desire to enforce the law, but by a desire to pressure a defendant into surrendering First Amendment rights, can be vitiated by requiring a defendant to await post-trial vindication.
 
 B.
 
 39
 We have concluded that the district court's order satisfies the collateral order doctrine because, under the unusual factual scenario presented here, the appellants are presenting a First Amendment "right not be to tried." Under the first of the factors set forth in Abney, the question whether this prosecution is barred because it violates the appellants' First Amendment rights has been conclusively determined. The district court expressly found no infringement of the appellants' speech rights.
 
 
 40
 Second, in ruling on the pretextual prosecution issue, the court resolved an issue completely collateral to the merits of the indictment's substance. The government focuses its arguments on the third element--whether the right may be vindicated on appeal from a final verdict. We conclude that the appellants have satisfied this element.
 
 
 41
 The government is alleged to be conducting a campaign against the appellants aimed at driving the company out of Utah or out of business entirely, using the primary strategy of forcing appellants to expend massive funds in defense costs in repeated criminal prosecutions.
 
 
 42
 The appellants assert that this campaign violates the rights secured by the First Amendment, because these officials are using the weight of the government's prosecutorial powers to disrupt the distribution of sexually oriented materials, at least some of which are protected by the First Amendment. The indictment is said to be part of a larger strategy of multiple prosecutions designed in part to drain their financial resources. The appellants assert that the government's motive here is not simply to obtain convictions but to burden the appellants with massive costs of defending themselves so as to drive them out of business, even though it is conceded that some if not all of the company's stock in trade is protected by the First Amendment against successful prosecution.
 
 
 43
 This case thus presents an unusual, perhaps unique confluence of factors: substantial evidence of an extensive government campaign, of which this indictment is only a part, designed to use the burden of repeated criminal prosecutions to chill the exercise of First Amendment rights. Under these circumstances we are persuaded that the district court's order implicates "important right[s] which would be 'lost, probably irreparably,' if review had to await final judgment...." Abney, 431 U.S. at 658, 97 S.Ct. at 2039-40 (quoting Cohen, 337 U.S. at 546, 69 S.Ct. at 1225-26).
 
 C.
 
 44
 In arguing that this court does not have jurisdiction, the government relies principally on the teachings of United States v. Hollywood Motor Car Co., Inc., 458 U.S. 263, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982) (per curiam), but that case is not relevant to our inquiry. It fails as a suitable analogy because the material facts do not implicate First Amendment concerns. There, the defendant was charged with a violation of customs laws. He obtained a change of venue, following which the government obtained a superseding indictment charging four new counts. The defendant moved for dismissal of the indictment on grounds of vindictive prosecution, and the district court denied the motion. The Court of Appeals for the Ninth Circuit asserted jurisdiction under the case law of that court applying the collateral order doctrine to refusals to dismiss for vindictive prosecution. 646 F.2d 384, 386 (9th Cir.1981) (citing United States v. Griffin, 617 F.2d 1342, 1344-46 (9th Cir.), cert. denied, 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980)). The Supreme Court reversed and ordered the appeal dismissed for lack of jurisdiction, determining that the defendant's assertion of vindictive prosecution could be protected on appeal from a conviction.
 
 
 45
 We do not believe this case to be properly analogous. The wrong alleged is similar, but the right sought to be vindicated is not. The Hollywood Motor Car defendant attempted to protect his procedural prerogative to seek a change of venue, as established by the Federal Rules of Civil Procedure. The protection of this procedural rule raises concerns distinct from and less pressing than the courts' obligation to protect the First Amendment right not to be subjected to a pretextual prosecution. The distinction we recognize here also applies to the reference which the government called to our attention at oral argument, Midland Asphalt Corp. v. United States, 489 U.S. 794, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989) (alleged violation of Rule 6(e), Fed.R.Crim.P., prohibiting disclosure of matters before a grand jury). The constitutional concerns implicated here require us instead to turn to those cases in which a prosecutor threatened the actual exercise of First Amendment rights.
 
 D.
 
 46
 What we believe to be controlling and relevant are the lessons distilled from Fort Wayne Books v. Indiana, 489 U.S. 46, 54-55, 109 S.Ct. 916, 922-23, 103 L.Ed.2d 34 (1989) (Court has jurisdiction to consider First Amendment challenge to state's criminal racketeering statute even though no final judgment had been rendered in state criminal prosecution); Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121-22, 14 L.Ed.2d 22 (1965) (bad faith prosecution brought to squelch right of free expression may itself constitute injury to First Amendment rights); Wilson v. Thompson, 593 F.2d 1375, 1382-83 (5th Cir.1979) (Anti-Injunction Act, 28 U.S.C. § 2283, does not bar federal injunctive relief against state prosecution brought in bad faith to deter exercise of First Amendment rights).
 
 
 47
 We also draw from the teachings of Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), a case addressing a challenge to the activities of the Commission to Encourage Morality in Youth, a nine-member board set up by Rhode Island to examine suspect materials and decide by majority vote whether the materials were obscene. Distributors and retailers of materials deemed obscene received notices from the commission containing thinly veiled threats of prosecution. Their names also were forwarded to the local police.
 
 
 48
 Bantam Books sued in state court to enjoin the sending of these notices and appealed to the U.S. Supreme Court, which held that the challenged activities of the Commission violated the First Amendment as applied against the states. Id. at 71, 83 S.Ct. at 639-40. The Court characterized the Commission's work as a "system of informal censorship." Id. "[T]he Fourteenth Amendment requires that regulation by the states of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression...." Id. at 66, 83 S.Ct. at 637.
 
 
 49
 The concept that the First Amendment may be interposed to prevent criminal prosecutions explicated in the Fort Wayne Books-Wilson- Bantam Books line of cases drew its nourishment from the seminal case of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). There, several civil rights organizations sued in federal court under 42 U.S.C. § 1983 for injunctive and declaratory relief, claiming that a Louisiana anti-subversion law was unconstitutional on its face. A three-judge court dismissed the complaint on the grounds that the federal courts should abstain until the state courts had interpreted the statute. Id. at 489, 85 S.Ct. at 1122. Subsequent to this ruling, a grand jury returned a criminal indictment under the statute. Id. at 484 n. 2, 85 S.Ct. at 1119-20 n. 2.
 
 
 50
 The Supreme Court first determined that the plaintiffs had standing. Considering the state's ongoing campaign of harassment, "substantial loss or impairment of freedoms of expression will occur if [the plaintiffs] must await the state court's disposition." Id. at 486, 85 S.Ct. at 1120-21. The Court found a necessity for immediate relief because an appeal following a conviction would not permit the plaintiffs to vindicate their First Amendment rights. Id. at 485, 85 S.Ct. at 1120.
 
 
 51
 The Court determined that the statute was overbroad and therefore facially invalid. The Court emphasized the inadequacy of waiting for a criminal trial to vindicate the plaintiffs' constitutional rights: "Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression." Id. at 494, 85 S.Ct. at 1125.
 
 
 52
 These cases stand for the proposition that the state may not use the agents and instrumentalities of law enforcement to curb speech protected by the First Amendment. The roving commission in Bantam Books and the campaign of harassment and intimidation in Dombrowski violated the rights of the individuals and companies targeted.
 
 
 53
 We have decided that these cases form the proper analogy and must command the threshold question of appealability. The gravamen of the appellants' argument is that the actual act of going to trial under a pretextual prosecution has a chilling effect on protected expression. Accordingly, because the right asserted is a "right not to be tried", Hollywood Motor Car, 458 U.S. at 267, 102 S.Ct. at 3083-84, we will take jurisdiction of this appeal from the order denying the motion to dismiss the indictment; "the decision ... involved an important right which would be 'lost, probably irreparably,' if review had to await final judgment." Abney, 431 U.S. at 658, 97 S.Ct. at 2039-40 (quoting Cohen, 337 U.S. at 546, 69 S.Ct. at 1225-26).
 
 IV.
 
 54
 Our ruling does not conflict with the judgment of our sister circuit in United States v. Butterworth, 693 F.2d 99 (9th Cir.1982), in which striking air traffic controllers moved for a dismissal of indictments charging violations of 18 U.S.C. § 1918(3) and 5 U.S.C. § 7311(3). The defendants argued that they had been targeted for prosecution solely because of their union activities and that the indictments therefore violated their First Amendment rights. The district court denied the motion to dismiss, and the defendants appealed. The Court of Appeals dismissed the appeal for lack of jurisdiction, relying on Hollywood Motor Car, 693 F.2d at 100.
 
 
 55
 But the material or adjudicative facts in Butterworth are substantially different from those before us. Here, the appellants have adduced evidence of an extensive pattern of prosecutorial conduct dating back some five years that suggests a persistent and widespread campaign to coerce the appellants into surrendering their First Amendment rights. The criminal indictment was only the most recent step in that effort.
 
 
 56
 We acknowledge that, "in the run of cases, '[t]he correctness of a trial court's rejection even of a constitutional claim made by the accused in the process of prosecution must await his conviction before its reconsideration by an appellate tribunal.' " Hollywood Motor Car, 458 U.S. at 269 n. 2, 102 S.Ct. at 3084-85 n. 2 (quoting Cobbledick v. United States, 309 U.S. 323, 325-26, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940)). As the Court has reiterated, "Bearing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship." Id. (quoting Cobbledick, 309 U.S. at 325, 60 S.Ct. at 541). But federal courts have asserted jurisdiction in a number of contexts involving non-final orders, in which the proceedings complained of infringe upon First Amendment rights. The jurisprudential reasons for this are clear:
 
 
 57
 A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms.... By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.
 
 
 58
 Dombrowski, 380 U.S. at 486-87, 85 S.Ct. at 1120-21.
 
 
 59
 The priority of the First Amendment rights asserted here, in the context of an uncontroverted, coordinated campaign of questionable prosecutorial activity, also supports appellate jurisdiction under our teachings in Bender v. Clark, 744 F.2d 1424 (10th Cir.1984). We recognized that instances arise "where the issue is not 'collateral' but justice may require immediate review," and the court should assert jurisdiction if "the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review." Id. at 1427. Considering the important rights at stake and the extensive evidence adduced by the appellants, this is an appropriate case in which to apply the principles of Bender and assert jurisdiction.
 
 
 60
 Accordingly, whether based on the Cohen or Bender doctrines, we hold that this court has proper jurisdiction to hear this appeal.
 
 V.
 
 61
 We now address the merits of the appeal and will consider first whether a key finding of fact that undergirds the district court's decision is clearly erroneous:
 
 
 62
 Defendants have presented voluminous evidence, some contested, of questionable motives and zealotry exhibited by prosecutors and government officials in North Carolina, Washington, D.C., and other points East. Defendants have failed, however, to connect such conduct in any significant way with the decision to seek an indictment against defendants in Utah in September 1990.
 
 
 63
 Dist.Ct.Op. at 7. The district court's opinion here was filed one year to the day after the final order in PHE, Inc. v. United States Dep't of Justice, 743 F.Supp. 15 (D.D.C.1990). The court had judicial knowledge that Richard N.W. Lambert was a defendant in proceedings that enjoined him and other defendants from bringing multiple prosecutions against PHE, Inc., one of the defendants here. Lambert's participation in what the District Court for the District of Columbia described as "a showing of bad faith" was described in at least seven separate instances in the court's narrative of facts, and several of the instances involved Lambert's conduct outside the District of Utah. 743 F.Supp. at 18, 20.
 
 
 64
 In addition to this reported case, which was called to the court's attention, the district court reviewed voluminous testimony, including Lambert's deposition, describing Lambert's role, not only as a participant, but as an admitted leader in the instant prosecution. Faced with the uncontradicted testimony of Lambert's activities, the district court's finding of fact that the "questionable motives and zealotry exhibited by prosecutors and government officials" in the eastern United States did not find its way to Utah cannot survive our review. Lambert played a leadership role in this conduct "in North Carolina, Washington, D.C., and other points East" as well as in Utah.
 
 
 65
 There is substantial evidence, largely uncontroverted, that Lambert was involved in the multiple prosecution strategy from its inception. The appellants became a target of that strategy as early as 1986, when PHE's premises were searched by state and federal agents, including prosecutors from the Utah United States Attorney's office. In that same year, Lambert and Ward met with appellants' attorneys. Lambert figured prominently in the investigation leading up to the indictment, and now appears as counsel for the government in this appeal.
 
 
 66
 We therefore conclude that Lambert was extensively involved in the multiple prosecution strategy against these appellants, and the district court's finding to the contrary was clearly erroneous.
 
 VI.
 
 67
 We now turn to the district court's apparent conclusion that the participation of United States Attorney Benson cleansed the indictment process of any impropriety that might have existed. The district court noted:
 
 
 68
 The final decision to seek an indictment was made by an independent screening committee under the direction of United States Attorney Dee Benson, who played no role in the previous four-year investigation of PHE and the resulting plea negotiations. As the government convincingly notes, there is no allegation of bad faith motivation on the part of Benson nor is any improper motive to be found in the prosecution memorandum prepared by Lambert and upon which Benson relied in deciding to seek an indictment.
 
 
 69
 Op. at 7. The government makes a similar argument here, stating that the final decision to seek an indictment was based on independent review of the evidence by Benson and the grand jury, and thus the indictment cannot have been improper. Govt.Br. at 21-23.
 
 A.
 
 70
 The government refers us to no authority for the proposition that a single untainted participant can render an otherwise vindictive prosecution permissible. Nor can the government do so, for this proposition is contrary to the case law generally and to United States v. Raymer, 941 F.2d 1031 (10th Cir.1991), in particular. The Raymer analysis bears emphasis:
 
 
 71
 Our inquiry must be whether, "as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or punitive animus towards the defendant because he exercised his specific legal right."
 
 
 72
 Id. at 1042 (quoting United States v. Gallegos-Curiel, 681 F.2d 1164, 1169 (9th Cir.1982)). The analysis is directed to determining how the decision to prosecute was actually made in the case under consideration. The court may not permit vindictiveness to be hidden behind procedural cosmetics. The test must be pragmatic. See also Council for Periodical Distr. Ass'n v. Evans, 642 F.Supp. 552, 556 (M.D.Ala.1986) (criminal prosecution enjoined if plaintiff shows conduct was constitutionally protected and improper purpose was "a major motivating factor and played a prominent role in the decision to prosecute"), aff'd in relevant part, 827 F.2d 1483 (11th Cir.1987).
 
 
 73
 In cases awarding damages to teachers dismissed for exercising their First Amendment rights, we have rejected the notion that referral to an independent board automatically cures the decision-making process of any improprieties. E.g., Saye v. St. Vrain Valley School Dist. RE-1J, 785 F.2d 862, 867 (10th Cir.1986) (school board's decision to fire teacher was based entirely on information provided by administrators with improper motives, therefore those improper reasons were presumed to be basis for board's decision); Smith v. Losee, 485 F.2d 334, 339 (10th Cir.1973) (en banc) (board of education's decision to deny tenure was based entirely on recommendation of university president with improper motives, which supports district court's finding that teacher was denied tenure for exercising his First Amendment rights), cert. denied, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974). The Supreme Court employed a similar approach in its leading case in this area. Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (plaintiff bears burden of showing that exercise of his First Amendment rights was "substantial factor" or "motivating factor" in school board's decision to terminate him).
 
 
 74
 We reiterate the First Amendment principles set out in Dombrowski:
 
 
 75
 [W]e have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.
 
 
 76
 380 U.S. at 486-87, 85 S.Ct. at 1120-21. The government appears to be arguing for a rule that would permit the prosecution to precede an indictment with a campaign of harassment and prosecutorial misconduct, so long as a single administrative prosecutor remains aloof, in a cordon sanitaire, and thus is able to act as a cleansing agent to remove any past misconduct by his associates and assistants should an indictment be forthcoming.
 
 B.
 
 77
 As a matter of law, moreover, even a good faith decision to continue a constitutionally tainted prosecution does not erase the taint when, as alleged here, the prosecution continues to utilize the fruits of the tainted behavior. For example, the unlawful seizure of evidence by one set of authorities is not cured by presenting the evidence on a "silver platter" to another set of authorities who use it in good faith. Elkins v. United States, 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). Similarly, a prosecution tainted by impermissible prosecutorial or police misconduct is not cured by turning it over to a new prosecutor, or, even, a grand jury. E.g., Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (promise made to defendant by one prosecutor binds another prosecutor in same office); United States v. Pascal, 496 F.Supp. 313 (N.D.Ill.1979). Finally, an indictment tainted by an improperly selected grand jury is not cured by a subsequent conviction by a properly constituted petit jury. Rose v. Mitchell, 443 U.S. 545, 557, 99 S.Ct. 2993, 3000-01, 61 L.Ed.2d 739 (1979).
 
 
 78
 In effect, the district court re-invented a version of the discredited "silver platter" doctrine by holding that underlings who knowingly participate in an unconstitutional scheme to conduct an unlawful criminal prosecution may cure the constitutional taint by disingenuously presenting the fruits of their unlawful activities to their superiors on a "silver platter." However, where, as here, a prosecution is premised on the fruits of constitutionally tainted behavior, we cannot permit the prosecution to continue, notwithstanding attempts to launder the taint by presenting the fruits to an independent prosecutor. Elkins, 364 U.S. at 215-16, 223, 80 S.Ct. at 1442-43, 1447.
 
 C.
 
 79
 Accordingly, we conclude that the district court's apparent conclusion that Benson's participation in the indictment process cleansed any impropriety is erroneous as a matter of law.
 
 VII.
 
 80
 These errors, however, do not constitute grounds for dismissing the indictment. The procedure we outlined in United States v. Raymer, 941 F.2d 1031 (10th Cir.1991), gives direction for further analysis. The defendant there sold illegal drugs in Texas and Oklahoma, was arrested in Oklahoma on drug charges, made bond, and was subsequently arrested in Texas on further drug charges. The defendant successfully opposed his extradition back to Oklahoma, whereupon Oklahoma had the state prosecutor deputized as a special Assistant United States Attorney, who then brought federal charges based on the defendant's activities in Oklahoma. The district court rejected the defendant's claim that the indictment was vindictive and retaliatory, and the defendant raised the issue on appeal from a conviction. We ruled that:
 
 
 81
 "There is no vindictiveness as long as the prosecutor's decision is based upon the normal factors ordinarily considered in determining what course to pursue, rather than upon genuine animus against the defendant for an improper reason or in retaliation for exercise of legal or constitutional rights." ... Our inquiry must be whether, "as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or punitive animus towards the defendant because he exercised his specific legal right."
 
 
 82
 Raymer, 941 F.2d at 1042 (quoting United States v. Gallegos-Curiel, 681 F.2d 1164, 1169 (9th Cir.1982)). We explained how the test was to be applied:
 
 
 83
 A defendant has the burden of proof and must establish either (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness. Thereafter, the burden shifts to the prosecution to justify its decision with legitimate, articulable, objective reasons.
 
 
 84
 Id. at 1040 (citations omitted). This court found that the defendant had not made the required showing. Id. at 1043.
 
 
 85
 This approach has been employed by other courts as well. See, e.g., United States v. Adams, 870 F.2d 1140, 1146 (6th Cir.1989) (where criminal defendant presents evidence of vindictive prosecution, defendant is entitled to evidentiary hearing and discovery to permit her to develop defense). The pragmatic and common-sense nature of the analysis also has been recognized. See Council for Periodical Distr. Ass'n v. Evans, 642 F.Supp. 552, 556 (M.D.Ala.1986) (criminal prosecution enjoined if plaintiff shows conduct was constitutionally protected and improper purpose was "a major motivating factor and played a prominent role in the decision to prosecute"), aff'd in relevant part, 827 F.2d 1483 (11th Cir.1987).
 
 
 86
 We conclude that appellants have already satisfied their burden of showing that the indictment is the tainted fruit of a prosecutorial attempt to curtail PHE's future First Amendment protected speech. Analogizing from the teachings Raymer, we are satisfied that they have met their burden of showing "either (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness." 941 F.2d at 1040. On remand the burden now shifts to the government "to justify its decision with legitimate, articulable, objective reasons." Id. In considering whether such proper reasons exist, the polestar to guide the district court on remand will be the controlling precept it recognized in its previous opinion in this case:
 
 
 87
 The inquiry is whether, " 'as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for the hostility or punitive animus towards the defendant because he exercised his specific legal rights.' "
 
 
 88
 Dist.Ct.Op. at 6 (quoting Raymer, 941 F.2d at 1042 (quoting United States v. Gallegos-Curiel, 681 F.2d 1164, 1169 (10th Cir.1982))) (emphasis supplied).
 
 
 89
 The case will be remanded for further proceedings in accordance with the foregoing discussion.
 
 The judgment of the district court is
 
 90
 REVERSED and the cause REMANDED.
 
 
 91
 McWILLIAMS, Circuit Judge, dissenting.
 
 
 92
 A federal grand jury in the District of Utah returned an indictment against PHE and other defendants, charging them in eleven counts of transporting into Utah obscene matter as magazines and video tapes, and of sending through the mail to children and adults unsolicited catalogs advertising obscene matter. The defendants filed a motion to dismiss the indictment, alleging bad faith and vindictiveness by the United States Attorney in bringing the charges against them. After an extended hearing, the district court denied the defendants' motion to dismiss the grand jury indictment. The defendants filed a notice of appeal from the district court's order denying their motion to dismiss the grand jury indictment.
 
 
 93
 Our jurisdiction is limited to "final decisions of the district court." 28 U.S.C. § 1291. The order of the district court denying defendants' motion to dismiss the grand jury indictment is not a "final judgment" and, in my view, does not come within any recognized exception to 28 U.S.C. § 1291. Accordingly, I would dismiss the appeal as being premature.
 
 
 94
 In concluding that this court lacks jurisdiction to hear this appeal, I rely on such cases as United States v. Hollywood Motor Car Co., et al., 458 U.S. 263, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982) and United States v. Butterworth, 693 F.2d 99 (9th Cir.1982).
 
 
 95
 In Hollywood Motor, the defendants in a two-count indictment returned in a federal court for the Eastern District of Kentucky succeeded in obtaining a change of venue to the Central District of California. In the latter district, the United States secured a superseding indictment charging four new substantive counts. The government thereafter obtained a voluntary dismissal of three of the six counts, and the defendants then moved to dismiss the remaining three counts in the indictment on the grounds that the superseding indictment manifested prosecutorial vindictiveness prompted by the fact that the defendants had obtained a change of venue for Kentucky to California. The district court denied the motion, and the defendants took an immediate appeal. The Ninth Circuit held that the district court's order denying defendants' motion to dismiss on the grounds of vindictiveness was immediately appealable as a final judgment under 28 U.S.C. § 1291. 646 F.2d 384 (9th Cir.1981). Reaching the merits, the Ninth Circuit held that the defendants had established prosecutorial vindictiveness which required a dismissal of the indictment.
 
 
 96
 On certiorari, the Supreme Court in Hollywood Motor summarily reversed the Ninth Circuit, holding that the denial of a motion to dismiss a grand jury indictment based on a claim of prosecutorial vindictiveness did not fall within the narrow group of claims coming within the collateral order exception to the final judgment requirement of § 1291, because such claim did not meet one of the tests for a collateral order exception, i.e., that the claim "be effectively unreviewable on appeal from a final judgment." In thus holding, the Supreme Court spoke in broader terms as follows:
 
 
 97
 Obviously, it is wholly desirable to correct prior to trial any substantive errors noticed at that time. It is equally evident that when relief must await postconviction proceedings, the defendant is subjected to the burden of defending himself at trial, even though the presence of errors might require reversal of his conviction and possibly a second trial. Nevertheless, reversal of the conviction and, where the Double Jeopardy Clause does not dictate otherwise, the provision of a new trial free of prejudicial error normally are adequate means of vindicating the constitutional rights of the accused (emphasis added).
 
 
 98
 Having been reversed in Hollywood Motor, the Ninth Circuit thereafter took a different approach on this issue of appealability in United States v. Butterworth, 693 F.2d 99 (9th Cir.1982). In Butterworth, striking air traffic controllers were indicted for participating in a strike against the United States in violation of 18 U.S.C. § 1918(3) and 5 U.S.C. § 7311(3). The defendants moved to dismiss their indictment on the ground of selective prosecution, the defendants contending that the government decided to prosecute them because their names were on a government list of appropriate targets for prosecution, which list, according to the defendants, was improperly drawn in response to their exercise of their First Amendment right to hold union office and to engage in union affairs.
 
 
 99
 After an evidentiary hearing, the district court denied the motion to dismiss, and the defendants took an immediate appeal. Based on the Supreme Court's ruling in Hollywood Motor, the Ninth Circuit held in Butterworth that it had no jurisdiction to hear defendants' appeal of the order of the district court denying their motion to dismiss the indictment. In Butterworth, the Ninth Circuit noted that the Supreme Court in Hollywood Motor drew a crucial distinction between a "right not to be tried" and a right whose remedy may require dismissal of charges in post-conviction proceedings, the former falling into the category of rights that can only be vindicated prior to trial, and the latter not so falling.
 
 
 100
 Under the circumstances, I fail to see how the defendants have any "right not to be tried" which might entitle them to an immediate review of the district court's denial of their motion to dismiss the indictment. The present case does not come within the parameters of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Neither Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) nor Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989), involves the question of whether a district court's order denying a defendant's motion to dismiss a grand jury indictment is immediately appealable. Hollywood Motor, supra, specifically involves that particular matter. Bender v. Clark, 744 F.2d 1424 (10th Cir.1984), relied on by the majority as an alternative basis for assuming jurisdiction, has no present pertinency. I would dismiss the appeal for lack of jurisdiction.
 
 
 
 *
 Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation