**Fred W. PHELPS, Sr.; and Edward F. Engel, Plaintiffs–Appellees,**

v.

**Joan HAMILTON, in her official capacity as District Attorney, Defendant–Appellant.**

**No. 93–3280.**

United States Court of Appeals, Tenth Circuit.

July 11, 1995.

Margie J. Phelps, and Elizabeth M. Phelps of Phelps–Chartered, Topeka, KS, for plaintiffs-appellees.

Carol R. Bonebrake, Asst. Atty. Gen., Office of the Atty. Gen., Topeka, KS, for defendant-appellant.

Before EBEL, McKAY, and REAVLEY,* Circuit Judges.

EBEL, Circuit Judge.

Plaintiffs–Appellees, Fred Phelps ("Phelps") and Edward Engel ("Engel") (collectively "Plaintiffs"), are both Topeka, Kansas residents active in a campaign against homosexuality. Defendant–Appellant Joan Hamilton ("Hamilton") is the district attorney for the Third Judicial District in Topeka. Following her election in 1992, Hamilton brought several prosecutions against Phelps for violating Kansas' criminal defamation statute. Plaintiffs brought this lawsuit (1) to invalidate Kansas' criminal defamation statute as facially overbroad; as well as (2) to enjoin the pending criminal defamation prosecutions against Phelps on the ground that the statute was unconstitutionally applied to him and overbroad on its face. The district court rejected Hamilton's motion for summary judgment based on the abstention doctrine set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), ruling that it need not abstain from intervening in the pending state court criminal prosecu-

tions.[1] *Phelps v. Hamilton,* 828 F.Supp. 831, 845 (D.Kan 1993). The district court then granted Plaintiffs' motion for summary judgment and issued first a preliminary injunction and then a permanent injunction invalidating Kansas' criminal defamation statute as facially overbroad and enjoining the prosecutions brought under that statute. Hamilton appealed, arguing that the district court should have abstained from intervening in the state court proceedings and that the district court erred in invalidating Kansas' criminal defamation statute. We exercise jurisdiction under 28 U.S.C. § 1291 and reverse and remand.[2]

As to Phelps, we conclude that the district court erred by refusing to abstain from enjoining the state criminal defamation prosecutions against him in the absence of proof by Phelps, and a finding by the district court, that the prosecutions were instituted in bad faith or to harass. Accordingly, we remand so that the district court can conduct further proceedings on that issue consistent with our opinion. Thus, we do not reach the merits of Phelps' "as applied" claim.

As to Engel, no criminal defamation prosecutions are presently pending against him. Rather, he alleges that he has previously been prosecuted under the state criminal defamation statute and intends to engage in future conduct that may trigger further prosecutions under the statute. Engel seeks a declaratory judgment that the statute is unconstitutionally overbroad on its face because it does not require actual malice before a criminal defamation prosecution may be brought for speech on matters of public concern. As *Younger* does not bar us from considering Engel's challenge, we reach the merits of his claim and conclude that the district court erred in holding Kansas' criminal defamation statute unconstitutional.

* The Honorable Thomas M. Reavley, Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. The district court also denied Hamilton's motion for summary judgment to dismiss Engel as lacking standing to file suit. Hamilton does not challenge that ruling on appeal.

2. After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed.R.App.P. 34(f); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

Thus, we reverse the district court's ruling on Engel's overbreadth challenge.[3]

## I. BACKGROUND

This case arises out a series of criminal defamation prosecutions against Phelps, a Topeka pastor leading a campaign against homosexuality, and Engel, a fellow activist against homosexual rights. Engel was indicted in 1991 for violating Kansas' criminal defamation statute, Kan.Stat.Ann. § 21–4004 (1988),[4] but the charges were dropped and no subsequent charges have been brought against him. Engel insists that he still intends to take part in the campaign against homosexuality and to continue engaging in political speech similar to that for which he had been previously charged with criminal defamation.

Phelps has engaged in a campaign against homosexuality and supporters of homosexual rights through picketing, distributing fliers, and transmitting telefacsimiles. During this campaign, Phelps allegedly made seven statements which apparently formed the basis of the six criminal defamation prosecutions pending against him.[5] Phelps claims that the criminal defamation prosecutions

based on these alleged statements were commenced in bad faith or to harass and that the multiple prosecutions are part of a political vendetta that Hamilton is waging against him. Moreover, he contends that his use of invective was for political effect and is protected by the First Amendment.

During the course of her 1992 campaign for district attorney, Hamilton made hate speech in general, and Phelps' use of epithets in particular, central parts of her platform. Hamilton promised that, if elected, she would initiate prosecutions under the criminal defamation statute and ban "hate," "prejudice," and "Fred."[6] Phelps argues that Hamilton singled him out for prosecution because of animosity between him and Hamilton's husband—pointing to a history of discord which culminated in a series of letters from Phelps to Hamilton's husband in which Phelps assailed the character of Hamilton's husband and accused him of womanizing. Hamilton denies that any such animosity affected her professional judgment and prosecutorial decisionmaking.

After Hamilton was elected district attorney, she commenced six prosecutions against Phelps for violating the criminal defamation

---

**3.** The district court also ruled on Phelps' identical overbreadth challenge. Because we reverse the district court's ruling on Engel's overbreadth claim, we also reverse the district court's ruling on that claim as to Phelps.

**4.** Kansas' criminal defamation law provides that:

(1) Criminal defamation is maliciously communicating to a person orally, in writing, or by any other means, false information tending to expose another living person to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social acceptance, or tending to degrade and vilify the memory of one who is dead and to scandalize or provoke his living relatives and friends.
(2) In all prosecutions under this section the truth of the information communicated shall be admitted as evidence. It shall be a defense to a charge of criminal defamation if it is found that such matter was true.
(3) Criminal defamation is a class A misdemeanor.
Kan.Stat.Ann. § 21–4004 (1988).

**5.** While Phelps' exact statements are not found in the record on appeal, Hamilton has represented, and Phelps has not denied, that the statements at issue are:

1. Officer Shannon "has been caught by park department employees having sex with teenage boys in the Burnett Mound Park...."
2. "Fag T[opeka] P[olice] D[epartment] Cop Doug Shannon Molests Kids."
3. Counsel [sic] Member Beth Meckler's blood bank record of 1988 is "tainted with a social disease (genre of Aids or HIV positive)."
4. Katie Frisbee, "during her life on earth lifted up her hand against the Lord's Church and People, doing them much evil ..." and further statements [sic] that the deceased, Katie Frisbie, was a lier [sic].
5. Jeffrey Harrington and Mary Lou Schmidt are "homosexuals."
6. "Kevin Oldham played Russian roulette with promiscuous anal sex and lost big time ..." and "[f]ar worse, an apostate church will pervert the gospel of Jesus Christ on April 10 by holding a memorial service for this dead uncircumcised Philistine...."
7. "Dike York promotes same sex marriages" and she is "seeking to legalize same sex marriages and to force their unnatural, God-defying lifestyles down our throats."
Br. of Appellant at 17–18 (citations omitted).

**6.** This statement allegedly referred to Plaintiff-Appellee, Fred Phelps.

statute and one prosecution for disorderly conduct.[7] Two of these prosecutions stem from activity before Hamilton took office, and all seven of these prosecutions were filed between Hamilton's oath of office on January 11, 1993 and April 20 of that year.

After the first two state criminal defamation cases were filed, Phelps and Engel commenced this action in federal court seeking declaratory and injunctive relief—i.e. the invalidation of Kansas' criminal defamation statute and an injunction enjoining the state court criminal defamation proceedings against Phelps. After considering both parties' motions for summary judgment, the district court granted Plaintiffs' request for declaratory and injunctive relief. Hamilton now appeals.

## II. DISCUSSION

Hamilton raises two arguments on appeal: (1) that the district court should have abstained from intervening in the pending criminal defamation prosecutions against Phelps in the absence of a finding of bad faith or harassment; and (2) that, even if intervention was proper, the district court should not have invalidated Kansas' criminal defamation statute as facially overbroad. As to Hamilton's first argument, we conclude that the district court failed to apply the proper standard for considering whether the prosecution was commenced in bad faith or to harass so as to warrant federal intervention into Phelps' pending state criminal defamation prosecutions. That is, in considering Hamilton's motion for summary judgment, the district court wrongly enjoined the state criminal defamation prosecutions against Phelps without first requiring Phelps to

prove that the criminal defamation prosecutions had been instituted in bad faith or to harass.[8] Thus, we must remand the abstention issue for further factfinding so that the district court can properly determine if Phelps can meet his burden of demonstrating that the criminal defamation prosecutions pending against him were commenced in bad faith or to harass. If Phelps can meet this burden, then the district court should consider the merits of his "as applied" constitutional challenge.[9]

We next consider Plaintiffs' facial overbreadth challenge to the statute in connection with Engel's claim. We conclude that the criminal defamation statute, when properly interpreted, passes constitutional muster, and accordingly we reverse the district court's ruling on that issue as it applies to Engel (and Phelps).

■ We review the district court's summary judgment rulings *de novo. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). Even though *Younger* is an equitable doctrine, its application is mandatory, and thus, we also review *de novo* the district court's determination of whether to abstain from exercising jurisdiction. *Seneca–Cayuga Tribe v. Oklahoma ex rel. Thompson,* 874 F.2d 709, 711 (10th Cir.1989). In reviewing the record to determine whether any dispute of material fact exists, we view all evidence and inferences in favor of the party opposing the motion for summary judgment. *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991).

### A. PHELPS' CLAIMS

■ *Younger* authorizes federal courts to enjoin a pending state criminal prosecution

---

7. The record is unclear as to the status of the disorderly conduct prosecution. However, this appeal does not implicate that prosecution because the district court's injunction only applied to present and future prosecutions brought under Kansas' criminal defamation statute. *See* Appellant Appendix at 1.

8. The court initially addressed abstention in the context of Plaintiffs' motion for a preliminary injunction. In that context, it erroneously concluded that it could grant the preliminary injunction upon the mere showing of a genuine issue of material fact as to whether the prosecutions were

motivated "at least in part" by bad faith or a desire to harass. It then issued a permanent injunction without taking further evidence or issuing further findings. Thus, at no time did the district court require Phelps actually to prove that the prosecutions were instituted in bad faith or to harass, and at no time did the court actually enter a finding of bad faith or harassment. *See* n. 17 *infra.*

9. The district court did not consider the merits of Phelps "as applied" claim because it invalidated the entire statute as facially overbroad.

provided that it was (1) commenced in bad faith or to harass, (2) based on a flagrantly and patently unconstitutional statute, or (3) related to any other such extraordinary circumstance creating a threat of "irreparable injury" both great and immediate. 401 U.S. at 53–54, 91 S.Ct. at 754–55; *see also Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611, 95 S.Ct. 1200, 1211–12, 43 L.Ed.2d 482 (1975). As Phelps does not allege that this case fits into the catch-all but ill-defined category of "extraordinary circumstances," we need only consider whether the prosecutions against him are based on a "flagrantly and patently" unconstitutional statute or were commenced in bad faith or to harass.

■ In considering whether a federal plaintiff meets one of the exceptions to *Younger* abstention, federal courts must balance the necessity of protecting an individual's exercise of his or her constitutional rights with a prosecutor's discretion in selecting certain actions for criminal prosecution.[10] Moreover, federalism concerns counsel against federal court intervention into state prosecutions so that the state judiciary will have the opportunity to correct any prosecutorial violations of an individual's constitutional rights. These twin rationales of respecting prosecutorial discretion and federalism explain why the exceptions to *Younger* only provide for a "very narrow gate for federal intervention." *Arkebauer v. Kiley,* 985 F.2d 1351, 1358 (7th Cir.1993).[11]

We first address the exception to *Younger* abstention for flagrantly and patently unconstitutional statutes. The standard for enjoining a pending state court proceeding based upon an unconstitutional state statute requires that the law be " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' " *Younger,* 401 U.S. at 53–54, 91 S.Ct. at 755 (quoting *Watson v. Buck,* 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941)). It is not clear whether this phrase was intended to be construed literally to mean that a statute must be unconstitutional as applied to every conceivable situation, or whether it means only that a statute must be unconstitutional under any possible interpretation as applied to the facts of the instant case. *Compare Trainor v. Hernandez,* 431 U.S. 434, 447, 97 S.Ct. 1911, 1919–20, 52 L.Ed.2d 486 (1977) *with id.* at 463, 97 S.Ct. at 1927–28 (Stevens, J., dissenting). Nevertheless, it is clear that the unconstitutionality of the statute must be patent and obvious. Regardless of how we would interpret this exception, it is unavailing to Phelps because, as we hold in Part IIB, the Kansas statute is not unconstitutional; thus, this exception to *Younger* abstention is inapplicable to the instant case.

■ We turn, then, to the exception to *Younger* abstention that allows a federal court to enjoin a pending state prosecution that is brought in bad faith or to harass.[12]

**10.** The Supreme Court has explained the importance of allowing for prosecutorial discretion:

"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364 [98 S.Ct. 663, 668, 54 L.Ed.2d 604] (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985).

**11.** Of course, if the Anti–Injunction Act, codified at 28 U.S.C. § 2283, barred the federal courts from considering civil rights claims for injunctive relief, the gate allowing for Phelps' claim for federal intervention would be shut. However, while *Younger* specifically reserved judgment on this issue, 401 U.S. at 54, 91 S.Ct. at 755, the Supreme Court subsequently determined that § 2283 does not preclude § 1983 actions. *See Mitchum v. Foster,* 407 U.S. 225, 242–43, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972).

**12.** The terms "bad faith" and "to harass" may have slightly different meanings, although they will, to a large degree, overlap. Ordinarily, a bad faith prosecution will not be predicated upon probable cause. *See Kugler v. Helfant,* 421 U.S. 117, 126 n. 6, 95 S.Ct. 1524, 1531 n. 6, 44 L.Ed.2d 15 (1975). However, if prosecutions are brought for the purpose of chilling or preventing a defendant from exercising his or her constitu-

Three factors that courts have considered in determining whether a prosecution is commenced in bad faith or to harass are: (1) whether it was frivolous or undertaken with no reasonably objective hope of success, *see Kugler v. Helfant*, 421 U.S. 117, 126 n. 6, 95 S.Ct. 1524, 1531 n. 6, 44 L.Ed.2d 15 (1975) (explaining that a bad faith prosecution "generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction"); [13] (2) whether it was motivated by the defendant's suspect class or in retaliation for the defendant's exercise of constitutional rights, *see Younger*, 401 U.S. at 48, 91 S.Ct. at 752–53 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 482, 85 S.Ct. 1116, 1118–19, 14 L.Ed.2d 22 (1965)); [14] and (3) whether it was conducted in such a way as to constitute harassment and an abuse of prosecutorial discretion, typically through the unjustified and oppressive use of multiple prosecutions, *cf. Younger*, 401 U.S. at 49, 91 S.Ct. at 753.[15] These factors are important because the cost, anxiety, and inconvenience of defending against a single prosecution brought in good faith is not enough to establish the "great and immediate" threat of irreparable injury necessary to justify enjoining pending state proceedings.

In the instant case, Phelps does not attempt to demonstrate that the criminal defamation prosecutions had no prospect of success; in fact, the issuance of the arrest warrants against Phelps on the criminal defamation charges,[16] and a review of the content of the statements themselves, suggest that the statements made by Phelps could arguably

---

tional rights, this may constitute a harassing and/or bad faith prosecution, even though the charges are predicated on probable cause. *See, e.g., Perez v. Ledesma*, 401 U.S. 82, 118 n. 11, 91 S.Ct. 674, 693 n. 11, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part and dissenting in part) ("Bad-faith harassment can, of course, take many forms, including arrests and prosecutions under valid statutes where there is no reasonable hope of obtaining a conviction, and a pattern of discriminatory enforcement designed to inhibit the exercise of federal rights.") (citations omitted); *Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir.) ("a refusal to abstain is also justified [even when there is a reasonable expectation of a successful prosecution] where a prosecution ... has been brought to retaliate for or to deter constitutionally protected conduct"), *cert. denied,* —— U.S. ——, 115 S.Ct. 480, 130 L.Ed.2d 393 (1994); *United States v. P.H.E., Inc.*, 965 F.2d 848, 853 (10th Cir.1992) ("[A] prosecution motivated by a desire to discourage expression protected by the First Amendment is barred and must be enjoined or dismissed, *irrespective* of whether the challenged action could possibly be found to be lawful.") (emphasis added); *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir.) (per curiam) ("A [showing of retaliation] will justify an injunction *regardless* of whether valid convictions could conceivably be obtained.") (emphasis added), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981).

13. *See, e.g., Central Ave. News, Inc. v. City of Minot, N.D.*, 651 F.2d 565, 570 (8th Cir.1981).

14. *See, e.g., P.H.E.*, 965 F.2d at 860 (holding that the strategy of bringing a series of multiple prosecutions against a defendant to curtail the defendant's exercise of constitutional rights constituted bad faith and harassment); *Fitzgerald*, 636 F.2d at 945 (explaining that a showing that a prosecution was brought in retaliation for, or to

discourage, the exercise of constitutional rights "will justify an injunction regardless of whether valid convictions conceivably could be obtained"); *Heimbach v. Village of Lyons*, 597 F.2d 344, 346–47 (2d Cir.1979) (per curiam) (allegation that prosecutions were initiated for the purposes of chilling First Amendment rights and without hope of conviction was sufficient to overcome *Younger* bar against federal court intervention); *Timmerman v. Brown*, 528 F.2d 811, 815 (4th Cir.1975) (enjoining prosecution of prisoners as retaliation or to deter filing civil charges against prison guards who attacked them); *Wichert v. Walter*, 606 F.Supp. 1516, 1521–22 (D.N.J. 1985) (enjoining the disciplinary hearing of a teacher brought as a retaliatory measure for political conduct).

15. *See, e.g., P.H.E.*, 965 F.2d at 851 (10th Cir. 1992) (emphasizing that the government brought a series of multiple prosecutions against a single defendant as part of its analysis of bad faith and harassment); *Krahm v. Graham*, 461 F.2d 703, 705–07 (9th Cir.1972) (finding the existence of bad faith in a case where the prosecutor filed 14 cases charging the sale of obscenity after 6 such cases were found not guilty over the previous two weeks and the prosecutor had as many as 21 cases pending against certain defendants).

16. While Hamilton represents in her brief that she obtained arrest warrants for the prosecutions against Phelps, she failed to include the underlying documents in her appendix. However, as Phelps does not challenge this representation, we accept it as true. Specifically, Hamilton stated that three separate judges determined that " 'there [we]re reasonable grounds for believing that ... one Fred W. Phelps, Sr. did then and there, unlawfully, intentionally and willfully' commit the crime of criminal defamation." Br. of Appellant at 13 (internal quotations omitted).

be the basis of a conviction for criminal defamation. Hence, Phelps' argument for federal court intervention must rest on his allegations that the prosecutions were commenced in retaliation for the exercise of his constitutional rights and that so many prosecutions were brought as to rise to the level of prosecutorial harassment.

As a starting matter, we cannot ignore the "repeated judicial authorization[s] for [Hamilton's] conduct," and it thus becomes incumbent upon Phelps to advance either some impeachment of such authorizations or some extrinsic evidence why Hamilton could not, and did not, in good faith rely on those judicial determinations. *Hicks v. Miranda,* 422 U.S. 332, 351, 95 S.Ct. 2281, 2292–93, 45 L.Ed.2d 223 (1975). Moreover, Phelps has a heavy burden of proof in order to overcome the bar of *Younger* abstention. Under *Younger,* intervention cannot be predicated on mere allegations; rather, the federal plaintiff must *prove* bad faith or harassment before intervention is warranted. Thus, in *Perez v. Ledesma,* a companion case to *Younger,* the Supreme Court explained that federal courts should limit intervention to "cases of *proven* harassment or prosecutions undertaken by state officials without hope of obtaining a valid conviction." 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1971) (emphasis added); *see also Juidice v. Vail,* 430 U.S. 327, 338, 97 S.Ct. 1211, 1218–19, 51 L.Ed.2d 376 (1977) (without proof of bad faith or harassment, federal courts must abstain from intervention); *Suggs v. Brannon,* 804 F.2d 274, 278 (4th Cir.1986) (same). With these principles in mind, we turn to Phelps' arguments that the prosecutions pending against him were (1) in bad faith because they were motivated by a desire to retaliate against him for exercising his constitutional rights; and (2) constituted harassment.

In order to prevail on his retaliation claim, Phelps must prove that "retaliation was a major motivating factor and played a dominant role in the decision to prosecute." *Smith v. Hightower,* 693 F.2d 359, 367 (5th Cir.1982). If Phelps can make an initial showing of retaliatory animus, the burden then shifts to Hamilton to rebut the presumption of bad faith by offering " 'legitimate, articulable, objective reasons' " to " 'justify [her] decision' " to initiate these prosecutions against Phelps. *United States v. P.H.E., Inc.,* 965 F.2d 848, 860 (10th Cir. 1992) (quoting *United States v. Raymer,* 941 F.2d 1031, 1040 (10th Cir.1991)); *United States v. Adams,* 870 F.2d 1140, 1146 (6th Cir.1989) (alleging sufficient circumstances to support the inference of a vindictive prosecution establishes a prima facie case of vindictiveness); *cf. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (after public employee establishes constitutional violation was a substantial motivating factor, the burden shifts to the public employer to demonstrate that he or she would have acted in the same manner absent the employee's exercise of constitutional rights). Ultimately, however, Phelps bears the burden of proving that the unconstitutional retaliation was the substantial motivating factor behind Hamilton's decision to commence the criminal defamation prosecutions.

With regard to Phelps' claim of harassment based upon an excessive number of prosecutions, Phelps must demonstrate both the existence of a substantial number of prosecutions and that a reasonable prosecutor would not have brought such multiple charges under similar circumstances. While the threshold test does not require a specific number of prosecutions, it is clear that the number of prosecutions must reach an oppressive level. *See Timmerman v. Brown,* 528 F.2d 811, 815 (4th Cir.1975) (the touchstone of harassment is "a legal exercise of authority in such a manner as to be unnecessarily oppressive"). Moreover, mere numbers alone do not tell the full story. For example, even multiple prosecutions may not be overly burdensome if the prosecutions are, or are likely to be, consolidated into a single trial. Furthermore, the reasons why the prosecutor brought multiple prosecutions are also important—e.g. was it to wear the defendant down with the financial and emotional expense of multiple trials, or was it because the events themselves were separated by time or jurisdiction or otherwise by

factors that explained the use of multiple prosecutions.

In his attempt to demonstrate that the prosecutions were in bad faith or to harass, Phelps argued to the district court that: (1) there was a history of ill will between Phelps and Hamilton's family; (2) Hamilton initiated seven prosecutions in a period of three months; (3) the criminal defamation statute was constitutionally suspect; (4) Hamilton made statements in her campaign for district attorney that she would prosecute Phelps; and (5) Hamilton initiated prosecutions against him despite the fact that his campaign against homosexual rights was constitutionally protected activity.

■ The district court initially considered these arguments in the context of Plaintiffs' request for a preliminary injunction. In that context, the court apparently concluded that it did not need actually to determine whether the prosecutions were commenced in bad faith or to harass provided that it concluded that Phelps had raised a genuine issue of material fact on the issue. When the district court entered its permanent injunction, it did so on the basis of its findings made to justify the issuance of a preliminary injunction. Thus, the district court never made a finding of bad faith or harassment. This failure to make any definitive finding on the issue of bad faith or harassment in conjunction with the issuance of the permanent injunction requires us to remand this case for further findings.[17] Nevertheless, to assist the district court in its consideration of bad faith or harassment on remand, we briefly address the legal significance of Phelps' arguments as to why the prosecutions brought against him were commenced in bad faith.

■ With regard to Phelps' first argument, we note that animus or ill-will between the parties does not, by itself, constitute retaliation. Indeed, no prosecutor looks favorably upon lawbreakers—whether they be purveyors of obscenity, drug dealers or those committing hate crimes. Thus, demonstrating a history of personal animosity between the prosecutor and the defendant is not, by itself, sufficient to show that a prosecution was commenced in bad faith. *See Davila v. Texas*, 489 F.Supp. 803, 809 (S.D.Tex.1980) (explaining that even a long and bitter personal history between the prosecutor and the defendant as well as the prosecutor's zealousness in prosecuting the case did not bring the case within the bad faith exception to *Younger*). That is not to say that personal animosity—if shown to exist—may not be probative of an improper motive, but in and of itself, such evidence cannot meet the burden of demonstrating that the prosecution was commenced in bad faith or to harass.

■ In considering Phelps' second argument, we note that the number of separate prosecutions is relevant, but the mere fact that Hamilton filed several prosecutions against Phelps is not dispositive because the parties' briefs suggest that the criminal defamation prosecutions were based on probable cause.[18] *See, e.g., Collins v. County of Ken-*

17. We also note that the district court evaluated whether to issue a preliminary injunction (and later a permanent injunction) based on the legal standard of whether the prosecutions were motivated "at least in part" by bad faith or harassment. We recognize that some courts have adopted the less exacting "at least in part" test for preliminary injunctions, while maintaining a higher standard for permanent injunctions. *See, e.g., Smith v. Hightower*, 693 F.2d 359, 367 n. 19 (5th Cir.1982); *Lewellen v. Raff*, 851 F.2d 1108, 1110 (8th Cir.1988) (per curiam), *cert. denied*, 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989). We are disinclined to adopt this approach because we view *Younger* as a quasi-jurisdictional bar based on federalism concerns which are equally valid whether considered in the context of an application for a preliminary or permanent injunction. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 2567–68,

45 L.Ed.2d 648 (1975) (underscoring that even preliminary injunctive relief "seriously impairs the State's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of *Younger*"). Even if we were to relax the burden of proof in the context of a preliminary injunction (i.e. reduce it to a likelihood of establishing bad faith or harassment), we still would see no basis at the preliminary injunction stage to reduce the substantive element of motivation from a "major motivating factor" to "at least in part motivated by."

18. Federal courts underscore that the weight of the evidence presented in a case is an important consideration in the bad faith inquiry because "[s]trong evidence of criminal violations supports the inference that the prosecutor is fulfilling his duty to bring evidence of criminal activity

*dall, Ill.,* 807 F.2d 95, 99 (7th Cir.1986) ("Instituting approximately thirty criminal prosecutions [against bookstore for obscene material] over a two-year period does not constitute bad faith or harassment in and of itself."), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987); *Grandco Corp. v. Rochford,* 536 F.2d 197, 203 (7th Cir.1976) (court "not persuaded that evidence of multiple prosecutions is sufficient by itself to support [the] necessary inference" of bad faith or harassment). That is, when an individual repeatedly engages in criminal behavior, there is always the risk of multiple criminal prosecutions. *Cf. Sandquist v. Pitchess,* 332 F.Supp. 171, 179 (C.D.Cal.1971) ("Where one distributes or exhibits a great number of different publications or films, each of which is colorably obscene, he assumes a risk of multiple prosecutions and the number of arrests and prosecutions he encounters cannot be determinative of whether bad-faith harassment has occurred.").

Phelps' third argument that the criminal defamation statute is constitutionally suspect is not a factor in considering Hamilton's motivation because, as we conclude below, the statute can reasonably be interpreted to conform with the Constitution. *See* discussion of Engel's claim, *infra.*

 As to Hamilton's campaign statements, the district court improperly viewed them as probative of an improper motive because Hamilton's statements attacking hate crime in general, and attacking Phelps in particular, related to the political debate over law enforcement policy. To view these statements as indicative of bad faith or harassment in subsequent prosecutions would intervene into prosecutorial discretion in case selection and chill political debate during campaigns for prosecutor—a result in contravention of First Amendment values. We must allow for and encourage debate about law enforcement strategy because prosecutorial decisionmaking and the political process for selecting prosecutors should reflect the public's judgment as to the proper enforcement of the criminal laws. While these judgments must be consistent with the Constitution, courts must not be too quick to second-guess state enforcement of its criminal laws. This "breathing space" for prosecutorial decisionmaking and debate is not without limits, of course. *See Shaw v. Garrison,* 467 F.2d 113, 118, 122 (5th Cir.) (enjoining district attorney's prosecution of defendant for perjury, after a previously failed prosecution for conspiracy to murder President Kennedy, because the district attorney pursued the prosecution to publicize his book), *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972). However, we must recognize the reality that decisions as to prosecutorial priorities understandably will be, and should be, the subject of political debate.

The district court also appeared to weigh the fact that Phelps engaged in some protected conduct in evaluating whether the prosecutions were commenced in bad faith or to harass. However, the critical inquiry is not whether Phelps engaged in some protected activity; rather, it is whether the prosecutor sought to limit Phelps' ability to conduct constitutionally protected speech by these criminal prosecutions. In the instant case, the basis of the criminal charges does not appear to be Phelps' picketing or the political views on homosexuality that he expressed; rather, the charges focus on allegations that he allegedly criminally defamed certain individuals in the course of his campaign. There is no apparent inconsistency between Phelps' ability to espouse his political views and holding him accountable if he criminally defames certain individuals in the process.

In sum, in order to warrant federal court intervention, Phelps must offer sufficient evidence to demonstrate that the prosecutions were substantially motivated by a bad faith motive or were brought to harass. Although we are skeptical that Phelps can meet this burden of proof, because the district court did not make any factual findings justifying an exception to *Younger* abstention, we remand for further consideration of this issue in accordance with the principles set forth in this opinion.

to the grand jury and not retaliating." *Hightower,* 693 F.2d at 369.

## B. ENGEL'S CLAIMS

It is uncontested that Engel's previous conduct and association with Phelps give him a sufficient personal stake in the outcome of the suit to have standing to challenge the criminal defamation law.[19] *See Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975); *see also Wooley v. Maynard*, 430 U.S. 705, 711–12, 97 S.Ct. 1428, 1433–34, 51 L.Ed.2d 752 (1977) (holding that past criminal proceedings may indicate the likelihood of future prosecution and support a claim for declaratory and injunctive relief). However, because Engel's interests in this case are so closely related with Phelps' interests, we must consider the possibility contemplated in *Doran*, that "there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them." 422 U.S. at 928, 95 S.Ct. at 2566.

In *Doran*, the Court held that three owners of topless bars were legally distinct parties and abstention as to one did not require abstention as to the other two, even though they were "represented by common counsel, and have similar business activities and problems, [because] they [we]re apparently unrelated in terms of ownership, control, and management." *Id.* at 928–29, 95 S.Ct. at 2566. *Doran*, along with *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), and *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), form a trilogy of cases which govern the issue of whether a related party is barred by *Younger* from seeking federal court relief despite the absence of a pending prosecution as to that party. *Steffel* held that *Younger* did not bar an individual who heeded the warning of the police to avoid a prosecution for trespassing, while his companion was arrested in the process of distributing handbills, from seeking declaratory relief in federal court, even though there was an extant criminal proceeding against his companion for trespass. *Id.* at 475, 94 S.Ct. at 1223–24. On the other hand, *Hicks* held that *Younger* abstention applied to an action for declaratory relief brought by the owners of a movie theatre shortly after two of its employees had been charged with distribution of obscenity, concluding that the two legally distinct parties were so "intertwined" as to require abstention. *See* 422 U.S. at 349, 95 S.Ct. at 2291–92.[20]

In the instant case, although Phelps and Engel are co-plaintiffs and share the same political agenda, those facts alone are not enough to invoke the doctrine of derivative abstention, *see Doran*, 422 U.S. at 928–29, 95 S.Ct. at 2566–67, and there is no evidence in the record that Engel has brought his case merely " 'to annul the results of a state trial.' " *Wooley*, 430 U.S. at 711, 97 S.Ct. at 1433 (quoting *Huffman*, 420 U.S. at 609, 95 S.Ct. at 1210). Moreover, as Engel represents that he is motivated by his concern of facing future prosecutions which would impinge on the exercise of his constitutional rights, it would be unfair to hold his constitutional rights hostage to the outcome and timing of Phelps' criminal court proceedings. Hence, as Engel meets both the requirements of (1) facing a threatened prosecution and/or being potentially deprived of his constitutional rights, and (2) being unable to intervene in a state proceeding so as to have a meaningful opportunity to present his claim, *see Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 435–37, 102 S.Ct. 2515, 2522–24, 73 L.Ed.2d 116 (1982), derivative abstention is inappropriate. Thus, the district court correctly declined to abstain from considering the merits of Engel's overbreadth challenge pursuant to *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

---

**19.** Hamilton contested this issue before the district court, but has conceded on appeal that Engel has standing to challenge the criminal defamation statute.

**20.** The Supreme Court in *Hicks* also observed that the day after the federal plaintiffs filed their federal suit, they were named in a state criminal proceeding and that, "where state criminal proceedings are begun against the federal plaintiff after the federal complaint is filed but before any proceeding of substance on the merits have taken place in the federal courts, the principles of *Younger v. Harris* should apply in full force." 422 U.S. at 349, 95 S.Ct. at 2292.

■ Engel's facial challenge of Kansas' criminal defamation statute begins with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which sought to prevent a "chilling effect" on political speech by precluding public figures from asserting claims under civil defamation laws for a defamatory falsehood unless the alleged defamation was "made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726.[21] Eight months after *New York Times,* the Court extended the actual malice standard to criminal defamation statutes and struck down Louisiana's criminal defamation law because it failed to provide for an actual malice standard in cases involving matters of public concern. *Garrison v. Louisiana,* 379 U.S. 64, 78, 85 S.Ct. 209, 217–18, 13 L.Ed.2d 125 (1964).

Engel argues that the Kansas law is facially invalid because it suffers from the same constitutional deficiency. Kansas' criminal defamation law provides that:

(1) Criminal defamation is maliciously communicating to a person orally, in writing, or by any other means, false information tending to expose another living person to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social acceptance, or tending to degrade and vilify the memory of one who is dead and to scandalize or provoke his living relatives and friends.

(2) In all prosecutions under this section the truth of the information communicated shall be admitted as evidence. It shall be a defense to a charge of criminal defamation if it is found that such matter was true.

(3) Criminal defamation is a class A misdemeanor.

Kan.Stat.Ann. § 21–4004 (1988).

■ In considering whether Kansas' criminal defamation statute is facially overbroad, we must "proceed with caution and

restraint." [22] *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975). Hence, the statute "should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts and its deterrent effect on legitimate expression is both real and substantial." *Id.* (citations omitted).

■ The federal courts do not have the power to narrow a state law by disregarding plain language in the statute just to preserve it from constitutional attack. *Wilson v. Stocker,* 819 F.2d 943, 948 (10th Cir. 1987). However, we are permitted to construe ambiguous state statutes and to extrapolate the true meaning of such statutes according to traditional rules of statutory construction, and then to judge the constitutionality of such statutes as so construed. Among the statutory construction tools available to us are "the interpretations … given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). We are also permitted to utilize "the well-established principle that statutes will be interpreted to avoid constitutional difficulties," *Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988), and ultimately, we evaluate whether a statute is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," *Houston v. Hill,* 482 U.S. 451, 468, 107 S.Ct. 2502, 2513, 96 L.Ed.2d 398 (1987).

The parties agree that no Kansas appellate court has considered whether the actual malice standard of *New York Times* and *Garrison* applies to Kansas' criminal defamation statute. Hamilton claims that the statute should be so construed, arguing that: (1) we should presume that the Kansas legislature acted with full knowledge of, and intent to comply with, the *New York Times* and *Garrison* decisions when it subsequently enacted

---

**21.** No one here contends that Engel and Phelps are not public figures or that the issue of homosexual rights is not a matter of public concern.

**22.** In examining Kansas' criminal defamation statute, we must consider the district court's interpretation of Kansas state law *de novo. Schmidt v. Farm Credit Serv.,* 977 F.2d 511, 514 (10th Cir.1992).

this criminal defamation statute; (2) the Kansas courts have a strong rule of construction to interpret statutes so as to preserve their constitutional validity; (3) the "actual malice" standard of *New York Times* has long been applied in Kansas civil defamation cases; (4) this standard was also applied to the predecessor criminal defamation statute, and (5) the Kansas Criminal Code, Kan.Stat. Ann. § 21–3201 (1988), inserts criminal intent into all statutory offenses unless specifically excluded. Despite these arguments, the district court's examination of the Kansas Pattern Jury Instructions and the Kansas common law definition of malice led it to strike down the law as facially overbroad. *See Phelps*, 828 F.Supp. at 848, 850. For the reasons set forth below, we disagree.

■■■■ First, we must presume that the Kansas legislature acted with knowledge of existing constitutional law as to the permissible parameters of criminal defamation when it enacted Kan.Stat.Ann. § 21–4004 (1988). In interpreting this Kansas statute, we afford weight to Kansas' rules of statutory construction not only because they assist in ascertaining the intended meaning and application of the statute, but because they also embody substantive state policies under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny.[23] Kansas' principles of statutory construction explain that we must assume that the legislature was aware of and understood the relevant Supreme Court case law on defamation because: "It is presumed that the legislature, in amending a statute, acted with full knowledge and information as to the subject matter of the statute, as to prior and existing legislation on the subject of the statute, and as to judicial decisions with respect to prior and existing law." *State v. Coley*, 236 Kan. 672, 694 P.2d 479, 482 (1985) (citing *Szoboszlay v. Glessner*, 233 Kan. 475, 664 P.2d 1327 (1983)).

At the time the statute was enacted in its present form, the Supreme Court had decided both *New York Times* and *Garrison*, which clearly established that it would be unconstitutional to impose defamation liability upon a person for uttering false and defamatory statements about a public figure or related to a public issue unless the person publishing the defamation did so with actual malice—i.e. with knowledge of the falsity of the statements or with reckless disregard of their truth or falsity.

■■■■ Second, we must honor the practice of the Kansas courts to interpret Kansas legislation so as to uphold its constitutionality whenever possible. In *State v. Thompson*, the Kansas Supreme Court stressed that:

> it is the court's duty to uphold the statute under attack, if possible, rather than to defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. *City of Baxter Springs v. Bryant*, [226 Kan. 383] 598 P.2d 1051 (1979). We have stated that the fundamental rule of statutory construction, to which all others are subordinate, is that the purpose and intent of the legislature governs when that intent can be ascertained from the statute. In determining legislative intent, courts are not limited to a mere consideration of the language employed but may properly look to the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished and the effect the statute may have under the various constructions suggested.

237 Kan. 562, 701 P.2d 694, 696 (1985). The Kansas Supreme Court endeavors to avoid invalidating statutes because "[a] statute which is facially overbroad may be authoritatively construed and restricted to cover only conduct which is not constitutionally protected and, as construed, the statute will thereafter be immune from attack on grounds of overbreadth." *State v. Robinson*, 239 Kan. 269, 718 P.2d 1313, 1318 (1986) (citing *State v. Thompson*, 237 Kan. 562, 701 P.2d 694 (1985)); *see also State v. Motion Picture*

---

**23.** State rules of statutory construction should be applied by the federal courts in interpreting a state statute. *See Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 743–44 (7th Cir.1989) (construing a Wisconsin trade regulation statute pursuant to Wisconsin's rules of statutory construction so as to determine the meaning of the statute in the same manner as would the Wisconsin courts).

*Entitled "The Bet",* 219 Kan. 64, 547 P.2d 760, 766–67 (1976) (interpreting Kansas' obscenity statute in a manner consistent with the Constitution). Thus, Kansas courts strive to avoid striking down statutes based on the unintended criminalization of protected conduct.

Given Kansas' principles of statutory construction—searching for the intent of the legislature, seeking to uphold the statute against an overbreadth challenge, and avoiding an unintended criminalization of protected conduct—we do not view the challenged statute as criminalizing speech which the legislature knew was constitutionally protected, but rather as only intending to criminalize unprotected speech.

Moreover, there is support for the proposition that the Kansas courts have long required actual malice before an individual may maintain a defamation action on a matter of public concern. The Kansas legislature presumably was aware of that case law when it enacted the criminal defamation statute. For example, in *Coleman v. MacLennan,* the Kansas Supreme Court, after considering the granting of a jury instruction to employ the actual malice standard in a civil case, explained that "the rule of privilege is the same in both civil and criminal actions." 78 Kan. 711, 98 P. 281 (1908). Following this explanation, the court articulated that the privilege of commenting on matters of public concern requires the standard of actual malice in punishing defamation:

> Generally we think a person may in good faith publish whatever he may honestly believe to be true, and essential to the protection of his own interests or the interest of the person or persons to whom he makes the publication, without committing any public offense, although what he publishes may in fact not be true, and may be injurious to the character of others.

*Id.* 98 P. at 287.

While Engel concedes that the Kansas courts have applied the actual malice standard in civil defamation cases, he views this as irrelevant to the interpretation of its criminal counterpart. He distinguishes criminal cases from the law of civil defamation because the law of civil defamation is judge-made. In this regard, Engel cites to *State v. Wait,* 44 Kan. 310, 24 P. 354 (1890). It is true that *Wait* seems to hold that a criminal prosecution may be maintained against a newspaper for publishing false and defamatory statements about a lawyer in connection with a highly-publicized trial without regard for the good faith of the publisher. However, at another place in that opinion, the court suggests that there might be a privilege for good faith publications if the defamation involved a public official. *Id.* 24 P. at 356. In any event, the later case of *Coleman v. MacLennan* clearly equates the doctrine of privileged communications in criminal and civil defamation actions. That is, in both criminal and civil defamation actions, a publisher enjoys a good faith privilege if he or she reasonably believed the published material was truthful. We presume that the Kansas legislature would have looked to and relied on the subsequent opinion—i.e. *Coleman*—in enacting the criminal defamation statute. Furthermore, while the law of civil defamation is judge-made, the interpretation of the ambiguous and undefined "malice" requirement of the criminal statute also must be interpreted by the judiciary, and it stands to reason that if the judiciary had been committed to the actual malice standard in civil cases involving matters of public concern, it certainly would apply that standard to criminal cases—i.e. where rule of lenity concerns apply.

Finally, the Kansas Criminal Code provides that criminal intent shall be an element in all statutory offenses. *See* Kan.Stat. Ann. § 21–3201 (1988). The district court dismissed this argument because it concluded that the conduct being punished was the act of publication. Thus, according to the district court, the added element of intent only meant that publication had to be knowing and intentional, and did not require the publisher to know the statements were false. While that is certainly one permissible reading of the statute, there is another reading that the statute does not punish the mere publication of defamatory statements; rather, it punishes only the publication of *false* defamatory statements. Thus, it is the conduct of publishing false statements that the defendant must do intentionally. That inter-

pretation would require proof that the defendant knew the statement was false, and such an interpretation would fully comport with *New York Times* and *Garrison.* When two interpretations are possible, the rule of lenity in a criminal case requires the courts to choose the interpretation more favorable to the defendant.[24]

Should we refuse to interpret the statute in the same manner as would the Kansas courts—i.e. narrowly—we would reach the unseemly result that the constitutionality of the statute would be determined by whether the challenge was brought in federal or state court. As Kansas' criminal defamation statute is sufficiently ambiguous, we must follow the approach of the Kansas courts and interpret that statute as requiring actual malice in criminal defamation cases involving matters of public concern.[25] Therefore, we uphold the statute as facially valid.[26]

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of Engel's motion for summary judgment and hold that Kansas' criminal defamation statute is facially valid. We REMAND for further proceedings as to Phelps to determine whether the district court should abstain from considering Phelps' "as-applied" challenge to the Kansas criminal defamation statute. That is, further proceedings must consider, based on the standards outlined herein, whether Phelps can demonstrate that Hamilton commenced

the prosecutions against him in bad faith or to harass so as to warrant an exception to *Younger* abstention.

---

24. The district court also referred to *Fitts v. Kolb,* which noted that all state courts which have considered constitutional challenges to similar criminal defamation laws have invalidated them and "left the revisions to the state legislators." 779 F.Supp. 1502, 1511 & n. 42 (D.S.C. 1991). Moreover, the district court highlighted that *Fitts* refused to interpret the criminal defamation statute along the lines of South Carolina's civil defamation law because that law has been judicially developed while its criminal counterpart has been the province of the legislature. *Id.* at 1511–12. However, the district court failed to note two essential differences between *Fitts* and the instant case: (1) that, unlike Kansas courts, South Carolina courts have been hesitant to interpret statutes liberally to uphold them against challenge, *see id.* at 1511, and (2) that, unlike Kansas, South Carolina lacked an interpretation of a prior statute that included the actual malice standard for matters of public concern.

25. Because Phelps and Engel are both public figures engaged in debate over a matter of public concern, we need not address whether our interpretation of the Kansas statute would apply equally to an act of defamation pertaining to non-public issues and non-public figures. Although several of the construction tools we have applied suggest that this statute would require actual malice for all defamations (both public and private), we note that there is no constitutional requirement of actual malice for purely private defamations.

26. We note that this actual malice requirement could be satisfied by giving a jury instruction on privilege—that is, requiring the jury to find the presence of actual malice—in cases involving matters of public concern.